**STATE of Minnesota, Respondent,**

v.

**Eric William MITCHELL, Appellant.**

No. C0–97–136.

Supreme Court of Minnesota.

April 16, 1998.

Robert M. Speeter, Speeter, Johnson, Hamilton & Wurst, Minneapolis, Alan D. Margoles, St. Paul, for appellant.

Hubert H. Humphrey III, Atty. Gen., Michael K. Junge, McLeod County Atty., Jody L. Winters, Asst. McLeod County Atty., Glencoe, for respondent.

## OPINION

ANDERSON, Justice.

In November 1994, 15–year–old Eric William Mitchell participated in a convenience store robbery in Hutchinson, Minnesota during which he shot and killed the 19–year–old store clerk. Mitchell was charged with the murder and was certified to stand trial as an adult. A jury found him guilty of intentional first-degree murder during an aggravated robbery. The district court sentenced Mitchell to the mandatory adult sentence—life imprisonment with no possibility of parole for a minimum of 30 years. On appeal, Mitchell challenges the life sentence as applied to a 15–year–old, arguing that it is cruel or unusual punishment under the Minnesota Constitution; it violates his rights to substantive due process, procedural due process, and equal protection; and the district court incorrectly concluded that it lacked the inherent authority to depart from the mandatory adult sentence. Mitchell also argues that the court erred in its failure to give the jury instructions that he requested. We affirm Mitchell's conviction and sentence.

School let out early in Hutchinson on November 17, 1994, and several high school students and other young people "hung out" and listened to music at Jeffrey Meidl's apartment. Early that evening, 19–year–old Meidl, 20–year–old Jason Walters, 17–year–old Harley Hildenbrand, and 15–year–old Mitchell gathered in the back bedroom of Meidl's apartment. Mitchell was the youngest boy and the newest member to the group. Hildenbrand testified that although he was "not really good friends" with Mitchell, he had known him for about a year prior to the murder; Walters testified that he had known Mitchell for only a few weeks.

Walters told the other members of the group that he needed money, showed them his gun, an Intertech .22 semi-automatic, and asked if they knew of anyone who would buy

it from him. When they could not find a buyer, they formulated another plan. Hildenbrand and Mitchell, the two minors of the group, would rob a convenience store. Meidl would provide them with a car, and Walters would let them use his gun. Walters, the oldest member of the group, made a list telling the two younger boys what to do during the robbery. Walters then loaded the gun and handed it to Mitchell.

Hildenbrand and Mitchell took Meidl's car, drove around Hutchinson for a while, and then drove to George's Food and Fuel at 600 Adams Street. They parked the car and separately entered and exited the store at least two times. They returned to the store, where surveillance cameras recorded on videotape aspects of the shooting that followed. The videotape shows that Mitchell entered the store at 9:37:39 p.m. and confronted the cashier, Mickey Wilfert. Although Wilfert appeared to offer no resistance to the robbery, within 12 seconds, he was shot in the face. The force of the bullet pushed Wilfert back, and he fell to the floor. Mitchell then came around the counter and pointed the gun at Wilfert again. Unknown to Mitchell at the time, his wallet fell out of his pocket and onto the floor below the cash register. Mitchell then kicked at Wilfert with his right leg. He kicked so hard that his hand, which was on the open drawer of the cash register, caused the register to rock back and forth. The videotape showed that Hildenbrand was also in the store about this time. However, Hildenbrand testified at trial that he was not in the store when Wilfert was shot, but instead was outside operating as the lookout. Hildenbrand stated that he ran into the store after hearing a gunshot. After the shooting, Mitchell took the money from the cash register, Hildenbrand grabbed several packs of cigarettes, and the two boys ran from the store.

After they left the store, the videotape shows that Wilfert struggled to pull himself up. He pushed the burglar alarm button and then fell back to the floor. Minutes later, the police arrived and provided medical assistance. Wilfert was rushed to the hospital where the doctors tried to resuscitate him, but, at 10:30 p.m., Wilfert died from the gunshot wound to his head. At about the time Wilfert died, three police officers were at his parents' home to notify them of the shooting of their son.

At the Food and Fuel, the police recovered Mitchell's wallet from behind the counter and the videotape of the robbery from the store's surveillance cameras. The police soon ascertained that Hildenbrand and Mitchell were their prime suspects. The police obtained a description of the car that Hildenbrand and Mitchell were driving, and soon thereafter arrested the boys traveling west on Highway 19 in Sibley County between Gaylord and Winthrop. Mitchell and Hildenbrand were arrested at around 1:00 a.m., less than four hours after the murder. When arrested, Mitchell had blood stains on his tennis shoes and his right pants leg.

The police took Hildenbrand and Mitchell to the Sibley County Sheriff's Office. Shortly thereafter, the police concluded that Meidl and Walters were also involved in the crime. In the early morning hours of the next day, the police went to Meidl's apartment, and Meidl gave his consent for the police to search his apartment. In the apartment, the police found a jacket similar to the one Mitchell was wearing on the videotape. The police then went to Walters' home, and Walters led them to his pickup truck where the Intertech .22 was in a plastic case inside a nylon bag.

Later that same day, the McLeod County Attorney filed a delinquency petition against Mitchell in juvenile court, charging him with first-degree murder. The county attorney also requested that the juvenile court refer the matter to adult district court. The reference hearing began in February 1995, but was not completed until March due to the need for psychological evaluations. On May 5, 1995, the juvenile court signed an order referring the matter to adult district court. Mitchell appealed from this order. The Minnesota Court of Appeals affirmed in February 1996, concluding that the evidence amply supported the juvenile court's conclusion that Mitchell was not suitable for treatment within the juvenile system and that public safety would not be served under the juvenile court provisions. *In re E.W.M.*, C5–95–1214,

1996 WL 70977, at *1–2 (Minn.App.1996) (unpublished opinion), *pet. for rev. denied* (Minn., Mar. 28, 1996). This court denied Mitchell's petition for review of the reference decision. *Id.*

Because of the abundance of adverse media attention about the murder in Hutchinson, the McLeod County district court granted a change of venue to Mitchell. The trial began in Dakota County with jury selection on August 26, 1996. After jury selection was completed, Mitchell's attorney made a motion to stay the proceedings, alleging that Mitchell was incompetent to stand trial because, as the psychologist testified, Mitchell went "into trance states or dissociative states" during jury selection. The court granted the motion, held a competency hearing on September 3, and determined that Mitchell was competent to stand trial.

Testimony in the trial began on September 5 and continued through September 10. At trial, Mitchell maintained that Hildenbrand had shot Wilfert. In support of this position, he presented the testimony of George Hecker, a fellow prisoner of Hildenbrand and Mitchell. Hecker testified that after attending a jail Bible class, Hildenbrand had confessed to him that he was the one who shot Wilfert and that he had thrown the gun in the river after the shooting. Hildenbrand denied confessing to Hecker. However, part of Hecker's testimony was consistent with an earlier statement Hildenbrand had made to the police that he had thrown the weapon off a bridge in New Ulm. A forensic scientist from the firearms section of the Minnesota Bureau of Criminal Apprehension testified that the bullet fragments found in Wilfert's head may have come from Walter's Intertech .22, but also stated that they may have come from another gun. The record does not indicate that the police looked for a second weapon.

Both at the beginning and the end of trial, the district court instructed the jury on the relevant law. Throughout the trial, the attorneys and the court held in-chambers conferences regarding the jury instructions. Among defense counsel's requested jury instructions were three specific requests that the court denied. The first defense request denied by the court was to give a special instruction on circumstantial evidence, stating that "to convict, the circumstantial evidence must form a complete chain excluding any reasonable hypothesis of innocence." The court denied this request, but it did instruct the jury on the use of circumstantial evidence, stating that "in order to reach a conclusion beyond a reasonable doubt on circumstantial evidence alone, all circumstances proved must be consistent with that conclusion and inconsistent with any other rational conclusion."

Second, defense counsel requested that the court instruct the jury that in order to find Mitchell guilty of first-degree murder, the jury "must determine by proof beyond a reasonable doubt that Harley Hildenbrand did not shoot Mickey [Wilfert]." The court denied this request, but did instruct the jury that the state needed to prove Mitchell's guilt beyond a reasonable doubt. The court explained the burden of proof to the jury by stating:

> The burden of proof is upon the state. The defendant does not have to prove anything. Proof beyond a reasonable doubt is such proof as ordinary prudent men and women would act upon in their most important affairs.

> A reasonable doubt is a doubt based upon reason and common sense. It does not mean a fanciful or capricious doubt, nor does it mean beyond all possibility of doubt.

The third instruction Mitchell's counsel requested was an instruction on intent. Mitchell's counsel asked for an instruction stating that the defendant must have had intent "at the time the shot was fired" or "at the time the trigger was pulled." The court also denied this request, but did instruct the jury that to find intent, it must find that Mitchell

> acted with a purpose of causing death or believed that the act would have that result. Intent, being a process of the mind, is not always susceptible to proof by direct evidence but may be inferred from all the circumstances surrounding the event. It is not necessary that the defendant's act be premeditated.

After the court instructed the jury on the law to be applied in the case, both the state and Mitchell gave their closing arguments. The court then gave the jury procedural instructions on its deliberations. Later that same day, the jury returned its verdict, finding Mitchell guilty of one count of first-degree murder for committing an intentional killing during an aggravated robbery, one count of second-degree murder, and one count of aggravated robbery. Normally, when a defendant is convicted of first-degree murder, there is no sentencing hearing because the sentence is mandatory. Under Minn.Stat. § 244.05, subd. 4 (1996), the court must sentence a person convicted of first-degree murder to life imprisonment for a minimum of 30 years before becoming eligible for parole. Nevertheless, in this case defense counsel requested a sentencing hearing in light of Mitchell's age. The court stated that such a hearing was not required by law, but granted the request, ordered an expedited presentence investigation, and set a sentencing hearing for October 21, 1996.

The Department of Corrections compiled a presentence investigation report, and a psychologist prepared an evaluation of Mitchell. These reports contained information about Mitchell's childhood and past behaviors and revealed that Mitchell had already led a very difficult and troubled life.

Mitchell was born in Willmar, Minnesota on April 3, 1979. His parents were married at the time, but divorced when Mitchell was about one year old. After the divorce, Mitchell lived with his mother, who physically and emotionally abused him. Mitchell told the psychologist that his mother often hit him with objects including knives, wooden spoons, spatulas, and a broomstick. In recounting incidents of physical abuse, Mitchell said,

> I would give her the satisfaction of falling to the ground, although I learned not to whimper when she was doing it. Then she would say if I whimpered that she would give me something to cry about. Then one time I smiled when she was beating me and then she said "so smiling about it" and then beat me even harder.

Mitchell also recounted incidents of emotional abuse:

> Sometimes I have little flashbacks about her standing there telling me that I am a worthless loser, "stupid worthless son of a bitch, you're nothing, you'll never be anything, you're just a loser like your father. I wish I had a girl instead" and sometimes she would launch into that and say that's what she thought she had because I whined or something when she hit me.

Mitchell's aunt, his mother's sister, corroborated Mitchell's statements, saying she had seen welts on Mitchell and that she would not leave her own daughter in the care of Mitchell's mother because Mitchell's mother had once "slugged [the aunt's daughter] in the mouth without provocation."

While in the fourth grade, a bus knocked Mitchell off his bicycle. When he came home upset and hurt, his mother told him "if [he] kept crying she would really give [him] something to cry about." Mitchell said, "I wasn't going to die by her hands, I was going to kill myself and just get it over with." This incident led Mitchell to make his first suicide attempt. He described the suicide attempt and his mother's reaction:

> About the bus, she told me I deserved to be hit by the bus. I tried to hang myself and every time I passed out. I just kept coming back. That kind of sucked. Mom found me once in the house after I tried to hang myself in fourth grade and she dragged me into the bathroom and handed me a knife and said if you're going to do it, do it right and let's get it over with and don't waste my time. I started crying then and she said "I'll give you something to cry about."

In his report, the psychologist noted that this incident was one of Mitchell's earliest memories and expressed his opinion that Mitchell began to suffer from post-traumatic stress disorder at that time.

Mitchell made numerous other suicide attempts, repeatedly inflicted wounds on himself, and ran away from home on several occasions. At the time of the murder, he had dropped out of school, having completed the ninth grade and part of tenth grade. Before quitting school, he was doing poorly aca-

demically and had truancy problems. He was arrested twice for theft, but was not adjudicated either time. He was no longer living with his mother, but was staying at an apartment with friends. The psychologist described Mitchell as a "lost soul," basically a "street child," "seeking to find ways to belong somewhere after he had fallen out with his mother and gone on his own." The psychologist described Mitchell's participation in the crime as "no doubt an effort to prove himself and to find someplace to be included."

Mitchell stated that he had little or no contact with his father after his parents' divorce. On the rare occasions when his father did visit, he introduced Mitchell to alcohol. Mitchell started using alcohol in the fourth grade and started using marijuana in the fifth or sixth grade. At the time of the presentence investigation, Mitchell still did not know his father's address or where his mother was living.

Mitchell stated that he does not remember the night of the murder and continues to have nightmares about what happened. The psychologist stated that Mitchell "feels haunted by the victim, [and is] terrified to go to sleep for fear of having more nightmares and [demonstrates] frequent vigilance in that he hears the victim's voice whispering to him. There should be no mistaking that Mr. Mitchell experiences guilt." In a letter Mitchell prepared for the presentence investigation, he expressed remorse for what happened. He stated:

> Many of you wish I were dead for what happened that night. And personally, I could not agree with you more. If I could switch places with Mickey Wilfert I would do it and not think twice about it. If there was a death sentence I'd personally ask for it, and I'd never appeal once. No body should have been shot that night, and if someone should have been shot that night, it should have been me not Mickey Wilfert. I have never had a chance, never had any hopes or dreams, never had much to live for, so I've never cared much for living.

Not many people have ever cared either way either, just because no one's ever cared.

The psychologist found that Mitchell has an above average IQ—109—which places him at the 73rd percentile of intellectual ability. As such, he "shows the capacity to develop strong occupational skills and to function at an upper level vocational or entry-level professional/managerial level of occupational functioning." Further, his intelligence is evidence that he could benefit from and be able to actively participate in psychotherapy. The psychologist stated that Mitchell could receive successful treatment, but that it would need to be "extensive and long term," and concluded that "we might find quite a different individual in ten to fifteen years given appropriate treatment and education."

The court obtained written victim impact statements from Wilfert's parents regarding the effect of their son's murder. The statements were read at Mitchell's sentencing hearing. The Wilferts stated that after the police came to their door on the night of the shooting and told them what had happened to their son, they immediately called the hospital, only to be told that their son's life could not be saved. The Wilferts then went to the hospital to identify the body. When the doctor lifted the sheet, the Wilferts saw their son with a bloody head and a bullet hole below his left eye. Wilfert's father wrote that this memory is "not what you want imprinted on your mind for the rest of your life. Unfortunately, we still have not awoken from that nightmare."

At the sentencing hearing, defense counsel argued that to sentence a 15–year–old child [1] like Mitchell to life imprisonment with a minimum of 30 years before becoming eligible for parole is cruel or unusual punishment under the Minnesota Constitution. Defense counsel also argued that the sentence violated Mitchell's right to substantive and procedural due process. In response to these arguments, the judge said that he had been practicing law for 35 years, and there was "no question in [his] mind that this is the

---

1. We use the term "child" throughout this opinion because this is the term the legislature uses to describe those under 18 years old who are certified to stand trial as adults. *See* Minn.Stat. § 260.125 (1996).

darkest day [he has] ever had." The judge went on to state that he had "searched [his] soul really to determine what is the mitigating factor here. The only mitigating factor I can find is his age." Because age is not a basis to reduce a mandatory sentence, the judge observed "that the law should have a middle ground," but that he has a "responsibility beyond what I personally feel. * * * I have to determine [the sentence] from the law." The judge sentenced Mitchell to life imprisonment for the first-degree murder and 48 months for the aggravated robbery, the sentences to run concurrently. The judge then said that he believed it was his legal duty to impose the mandatory sentence and stated that "[w]hether it's cruel and inhuman punishment is something that the appellate courts are going to have to make a determination."

On appeal to this court, Mitchell argues that his sentence to life imprisonment is unconstitutional because (1) this sentence as applied to a 15–year–old child is cruel or unusual punishment under the Minnesota Constitution; (2) his right to substantive due process has been violated because there is no rational basis for the sharp difference between a juvenile sentence and the adult sentence; (3) his right to procedural due process has been violated because the court was unable to consider his age in sentencing; (4) his right to equal protection has been violated because there is no rational basis for treating him differently than other 15–year–old children who have committed first-degree murder; and (5) the district court incorrectly concluded that it lacked the inherent authority to depart from the mandatory sentence. Mitchell also argues that the district court erred in its failure to give the jury instructions that he requested.

### I.

Mitchell first argues that sentencing a 15–year–old child to life imprisonment without the possibility of parole for a minimum of 30 years is a cruel or unusual punishment in violation of the Minnesota Constitution. The Minnesota Constitution differs from the United States Constitution in that it provides that no "cruel *or* unusual punishments be inflicted," Minn. Const. art. I, § 5 (emphasis added), while the United States Constitution provides that no "cruel *and* unusual punishments" be inflicted, U.S. Const. amend. VIII (emphasis added). This difference is not trivial. The United States Supreme Court has upheld punishments that, although they may be cruel, are not unusual. *See Harmelin v. Michigan,* 501 U.S. 957, 994, 111 S.Ct. 2680, 2701, 115 L.Ed.2d 836 (1991) (concluding that even though severe mandatory penalties may be cruel, they are not unusual).

Neither this court nor the Supreme Court has addressed the specific issue of the constitutionality of sentencing a 15–year–old child to life imprisonment without the possibility of parole for 30 years. This court has held that a mandatory sentence for first-degree murder of life imprisonment for a 25–year minimum with time off for good behavior is not in itself cruel and unusual punishment. *State v. Walker,* 306 Minn. 105, 111, 235 N.W.2d 810, 814–15 (1975), *cert. denied,* 426 U.S. 950, 96 S.Ct. 3172, 49 L.Ed.2d 1187 (1976).[2] The Supreme Court has held that life imprisonment without the possibility of parole for cocaine possession is not cruel and unusual. *Harmelin,* 501 U.S. at 996, 111 S.Ct. at 2702. Further, the Supreme Court has concluded that it is cruel and unusual punishment to sentence a 15–year–old to death. *Thompson v. Oklahoma,* 487 U.S. 815, 838, 108 S.Ct. 2687, 2700, 101 L.Ed.2d 702 (1988) (plurality).

We have repeatedly made clear that "[t]he severity of criminal sanctions is a legislative concern. A lawmaking body is equipped to weigh the policy considerations involved and determine what sanctions, if any, serve the interests of the people it represents." *McLaughlin v. State,* 291 Minn. 277, 284, 190 N.W.2d 867, 872 (1971). In this case, the legislature has determined that a person convicted of first-degree murder is to receive a mandatory life sentence with a minimum of

---

**2.** *State v. Walker* was based on both the federal and the state constitutions. 306 Minn. at 110–11, 235 N.W.2d at 815. As such, the *Walker* court concluded that the sentence was not cruel *and* unusual punishment, but did not analyze the specific state standard forbidding cruel *or* unusual punishment. *Id.*

30 years. Minn.Stat. § 244.05, subd. 4. Once the juvenile court has waived jurisdiction, the state is to "proceed with the case as if the jurisdiction of the juvenile court had never attached." Minn.Stat. § 260.125, subd. 4 (1996). Further, the sentencing guidelines provide that sentences apply with the same presumptive force to a child who has been certified as an adult as they would to one who was 18 or older at the time of the crime. Minnesota Sentencing Guidelines III.D. Nevertheless, a legislatively-mandated punishment cannot stand if it is cruel or unusual in violation of the Minnesota Constitution.

▪ Generally, when determining whether a punishment is cruel or unusual, this court focuses on the proportionality of the crime to the punishment. *See, e.g., Walker,* 306 Minn. at 110, 235 N.W.2d at 814. The Supreme Court, in deciding whether punishment is cruel and unusual, asks if the punishment comports with the "evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality). Evolving standards of decency were crucial in *Thompson v. Oklahoma,* when the Court found that the execution of a 15–year–old is "now generally abhorrent to the conscience of the community." 487 U.S. at 832, 108 S.Ct. at 2697 (plurality). *See also id.* at 849, 108 S.Ct. at 2706 (O'Connor, J., concurring).

▪ Mitchell committed one of the most heinous crimes, murder in the first degree. As such, he was given a harsh penalty—life imprisonment for a minimum of 30 years. Therefore, we cannot say that his punishment was out of proportion to his crime. But, given that Mitchell was only 15 years old at the time of his crime, we also look to the evolving standard of decency at the time that Mitchell committed his crime to determine whether the punishment was cruel as applied to him.

Mitchell murdered Wilfert in November 1994, at a time when Minnesota juvenile law was undergoing significant change. During 1994, the Minnesota legislature revised the juvenile code, including the implementation of extended juvenile jurisdiction (EJJ), which allowed juvenile courts to impose upon a child a juvenile disposition and stay an adult sentence that could be executed later if the child failed to successfully complete the juvenile disposition. Minn.Stat. § 260.126 (1994). Under EJJ, the juvenile court retains jurisdiction over a child until the age of 21. Minn.Stat. § 260.181, subd. 4b (1994). The EJJ statute was implemented in part because of the perception that juvenile court dispositions were often too lenient while the adult court sentences were often too harsh when applied to children. Therefore, EJJ provided an alternative for children who had committed serious crimes or were chronic repeat offenders. The EJJ statute was signed into law on May 5, 1994, but did not take effect until January 1, 1995. Act of May 5, 1994, ch. 576 §§ 14, 68, 1994 Minn. Laws 945–47, 985, *codified at* Minn.Stat. § 260.126. Thus, the EJJ option was not available to the McLeod County court when it considered certification of Mitchell as an adult for a crime committed in November 1994.

The legislature also amended the certification statute in 1994, providing that a 15–year–old can be certified to adult court if the prosecuting authority proves by clear and convincing evidence that retaining the child in juvenile court will not serve public safety. Minn.Stat. § 260.125, subd. 2(6)(ii) (1994). This was a change from the statute under which Mitchell was certified, which provided that the prosecuting authority must prove by clear and convincing evidence either that the child is not suitable to treatment or that retaining the child in juvenile court will not serve public safety. Minn.Stat. § 260.125, subd. 2(d)(2) (1992). While the adequacy of available juvenile dispositions is still a factor in the decision under the amended statute, the main emphasis shifted from treatment options to public safety, with the court giving greater weight to the seriousness of the offense and the prior record of delinquency. Minn.Stat. § 260.125, subd. 2b (1994).

In 1994, at about the same time that the legislature was revising the juvenile code, this court considered the case of a 15–year–old child convicted of two counts of first-degree murder and two counts of attempted first-degree murder. *State v. Ouk,* 516 N.W.2d 180, 182 (Minn.1994). In that case,

the district court sentenced a 15–year–old boy to two life sentences and two 180–month sentences, all to be served consecutively. *Id.* at 184. In *Ouk*, we affirmed the conviction and concluded that the imposition of consecutive sentences was "commensurate with [Ouk's] culpability and does not exaggerate [his] criminality." *Id.* at 185. However, Ouk did not argue that his sentence was cruel or unusual; therefore, *Ouk* did not resolve the issue that is before us now. Nevertheless, the result in *Ouk* illustrates the more punitive approach being taken toward child criminals at the time when Mitchell murdered Wilfert.

Given that the public, the legislature, and the courts were growing increasingly intolerant of child crime and more tolerant of harsher penalties for child criminals, we cannot say that the life imprisonment of a 15–year–old child convicted of first-degree murder offended evolving standards of decency in 1994 or was generally abhorrent to the community.[3] Accordingly, we hold that such a punishment is not cruel under the Minnesota Constitution.

■ The conclusion that Mitchell's sentence is not cruel does not end our discussion because the Minnesota Constitution forbids punishments that are either cruel *or* unusual. Therefore, we must analyze whether such a sentence as applied to a 15–year–old child is unusual. Only one federal court has addressed the specific issue of whether it is cruel and unusual punishment under the federal constitution to sentence a 15–year–old to life imprisonment without the possibility of parole. *Harris v. Wright,* 93 F.3d 581, 583–84 (9th Cir.1996). In *Harris,* the Ninth Circuit Court of Appeals examined the issue

across the country. *Id.* The *Harris* court cited to the defendant's brief which stated that there are two states with statutes that explicitly preclude mandatory adult sentences for children below the age of 16, two states where the high courts have prohibited mandatory life sentences for children, 26 states which do not punish anyone with mandatory life sentences without the possibility of parole, and at least 21 states that do sentence 15–year–old children to life imprisonment without the possibility of parole. *Id.* The court used this information to conclude that no consensus exists among the states, and thus such a sentence does not offend evolving standards of decency nationwide. *Id.* at 584.

The fact that states are split on this issue provides some evidence that sentencing a 15–year–old child to life imprisonment is not unusual. This court has already affirmed a life sentence given to a 15–year–old child. *Ouk,* 516 N.W.2d at 185. As the state pointed out at oral argument, if this sentence is unusual in any way, it is only because it is unusual for a 15–year–old child to commit such a heinous crime. Therefore, we hold that Mitchell's punishment is not unusual.

Because we have concluded that a mandatory sentence of life imprisonment for a minimum of 30 years as applied to a 15–year–old child convicted of first-degree murder is neither cruel nor unusual, Mitchell's sentence does not violate the Minnesota Constitution's prohibition against cruel or unusual punishments.

## II.

■ Mitchell argues that the wide disparity in punishment for first-degree murder for

---

**3.** It is often difficult to ascertain the community's evolving standard of decency regarding children, especially because the attitudes towards children are often ambivalent. On the one hand, the legislature has moved towards more punitive sanctions for child criminals whom they believe should be held as accountable for their crimes as adults. On the other hand, the legislature continues to pass statutes that it considers to be protective of children, assuming that children are not as accountable as adults.

There are numerous examples of legislation that treat children differently from adults under the assumption that children are less capable or are in need of adult protection. *See, e.g.,* Minn.

Stat. § 201.014, subd. 1(a) (1996) (requiring that voters be 18 years old); Minn.Stat. § 609.343, subd. 1(a) (1996) (criminalizing sexual contact with a child under the age of 13 when the actor is more than 36 months older even if the 13–year–old consents to the contact); Minn.Stat. § 609.343, subd. 1(b) (1996) (criminalizing sexual contact with a child between the ages of 13 and 16 when the actor is more than 48 months older and in a position of authority over the child); Minn.Stat. § 609.685 (1996) (forbidding the sale of tobacco to children under 18 years old); Minn.Stat. § 617.293 (1996) (prohibiting the sale of pornography to children under 18 years old).

adults versus children violates his right to substantive due process. Mitchell points out that first-degree murder is the only offense for which a court cannot consider mitigating factors, and he argues that the fact that he was certified to be tried as an adult is separate from whether he should be sentenced as an adult. The state responds that the legislature has the power to determine appropriate punishment and that a life sentence for first-degree murder serves the legitimate state goal of protecting society.

■ Unless there is a fundamental right at issue, judicial scrutiny of state legislation under substantive due process is not exacting. *State v. Behl,* 564 N.W.2d 560, 567 (1997). This court has held that no person, regardless of age, has the right to a juvenile disposition. *Id.* Likewise, there is no fundamental right to have age considered in adult sentencing. When there is no fundamental right at issue, substantive due process requires only that a statute "not be arbitrary or capricious or, stated another way, that [it] be a reasonable means to a permissive object." *Id.* We have held that the automatic certification of a 16–year–old indicted for first-degree murder without a hearing did not violate substantive due process. *Id.* at 568 (applying Minn.Stat. § 260.015, subd. 5(b)). We have also held that a mandatory life sentence for first-degree murder does not violate substantive due process, even though such a sentence does not allow the district court to consider mitigating factors. *Walker,* 306 Minn. at 111, 235 N.W.2d at 815.

In *Behl,* we stated that we would prefer that the legislature provide the courts with the option to treat children differently than adults. *Behl,* 564 N.W.2d at 568. Here, as in *Behl,* we find no constitutional violation in the child's sentence, but we are sympathetic to the concern expressed by the district court judge who sentenced Mitchell when he stated that there should have been a "middle ground." Had Mitchell remained under the jurisdiction of the juvenile court, that court would have only had jurisdiction over him until he turned 19. Minn.Stat. § 260.181, subd. 4(a) (1996). His sentence would have been four years at most. Had Mitchell been treated under the EJJ alternative included in the 1994 legislation, the court would have been able to exercise its authority until Mitchell turned 21. *Id.* at subd. 4(b). Because he was certified as an adult, Mitchell must serve a mandatory minimum of 30 years, and may serve up to a life term in prison. A strong argument can be made that a four-year sentence is insufficient for a crime of this magnitude. After all, Mitchell shot Wilfert in the face while committing a robbery. But an equally strong argument can be made that 30 years in prison is excessive when applied to a 15–year–old child such as Mitchell who has never had a network of family and friends to provide him emotional support and was offered very little guidance from either his parents or his community.

Mitchell's background does not excuse or justify his crime—he is guilty of murder. But his background does speak to culpability and it adds to the tragedy of what occurred on the night of November 17, 1994. Just as Wilfert's life would have been spared had Mitchell not pulled the trigger, perhaps Mitchell would not have pulled the trigger had he had the support needed to grow up emotionally healthy. The greatest tragedy of this crime is that it was potentially preventable. It is a further tragedy that a 15–year–old will spend a minimum of 30 years in prison, especially given that his psychologist concluded that Mitchell could be "quite a different individual in ten to fifteen years given appropriate treatment and education."

We would prefer that the legislature had provided a sentencing alternative, such as indeterminate sentencing, for someone like Mitchell—someone still a child, yet certified to stand trial as an adult. But the legislature did not choose to provide such an alternative. Moreover, the legislature did not choose to grant the district court the authority to consider factors such as age when sentencing a 15–year–old child such as Mitchell who has been certified to stand trial as an adult and convicted of first-degree murder. Mitchell attempts to overcome this lack of authority by asserting that the statute violates substantive due process. But a defendant carries a great burden in proving that a statute violates substantive due process, and Mitchell has failed to meet this

burden. We conclude that it does not violate substantive due process that a court may not consider age as a mitigating factor when sentencing a child who has been certified as an adult and subsequently convicted of first-degree murder.

### III.

Mitchell further argues that sentencing him without considering his age violates his right to procedural due process. He argues that he had no opportunity to present "his most meaningful defense—lack of culpability due to his age and upbringing." The state replies that the court granted him a fair trial that provided him with due process before depriving him of his liberty.

Before a person can raise a procedural due process challenge, that person must first establish the loss of a protectable property or liberty interest. *Behl,* 564 N.W.2d at 566. Even if the statute allowed the district court to consider age as a mitigating factor to Mitchell's crime, he still will be incarcerated for some period of time and thus lose his liberty. In *Behl,* a similar case, this court stated that the only remaining interest is the interest in receiving a juvenile disposition. *Id.* We went on to say that "a person does not acquire a protectable interest in a juvenile disposition until the juvenile court has asserted its jurisdiction over the case." *Id.* at 567. Mitchell does not argue that he is entitled to a juvenile disposition, but only that his age should be a mitigating factor.

Procedural due process demands only that Mitchell have an opportunity to be heard, and this requires that the juvenile court grant a hearing before waiving jurisdiction. *Id.* Mitchell received a certification hearing on the issue of being tried as an adult. Under Minn. R. Juv. P. 32.05 (1994), the certification hearing judge was to consider the totality of the circumstances, including the sophistication and maturity of the child. The court of appeals reviewed the certification, concluding that the juvenile court had analyzed all the factors required by the rule and that there was ample evidence to support the court's findings and decision to certify Mitchell as an adult. *In re E.W.M.,* 1996 WL 70977 at *1–2. Once certification has taken place and the child is convicted, the court is to sentence a child according to the adult sentencing guidelines. Minnesota Sentencing Guidelines III.D. Mitchell had the opportunity to be heard on his age at the earlier certification hearing. Because the courts have already factored Mitchell's age into the certification decision, Mitchell's right to procedural due process has not been violated.

### IV.

Mitchell also contends that his sentence violates his right to equal protection because he is being treated differently than other 15-year-olds who commit first-degree murder, but over whom the juvenile court retains jurisdiction. The state responds that Mitchell was convicted of first-degree murder and his sentence is the same sentence given to all persons convicted of first-degree murder. Therefore, there is no unequal treatment.

The Equal Protection Clause requires that the state treat all similarly situated persons alike. *Behl,* 564 N.W.2d at 568. "Facial distinctions based on age and charged offenses do not create suspect classifications." *Id.* When a suspect classification is not at issue, the statute does not violate equal protection if it is rationally related to a legitimate government interest. *Id.* This court has previously held that the fact that children who are tried as adults receive harsher punishments than those retained in the juvenile system does not violate equal protection. *In re I.Q.S.,* 309 Minn. 78, 84, 244 N.W.2d 30, 36–37 (1976). After the court has determined that a child should be tried as an adult, the legislature then has a legitimate interest in public safety that is rationally related to the sentences it prescribes.

We further note that Mitchell's argument is factually flawed. He argues that a 15-year-old who is more amenable to treatment would remain in the juvenile system, while a 15-year-old who needed long-term care would be certified because the juvenile court could not provide adequate treatment before the child turns 19. Mitchell claims that his certification had nothing to do with his culpa-

bility, only his treatability, but the factual basis for this argument is misleading. When Mitchell was certified as an adult, the court was required to consider many factors. These factors included not only whether Mitchell could be adequately treated in the juvenile system by the time he turned 19, but also the seriousness of the offense, the circumstances of the offense, whether the offense was aggressive or violent, and whether the offense showed particular cruelty or disregard for the life of others. Minn. R. Juv. P. 32.05. Mitchell is incorrect when he asserts that the certifying court did not consider his culpability.

Mitchell's sentence does not violate his right to equal protection because he is not similarly situated to 15–year–olds who remain in the juvenile system. Mitchell is treated the same as all persons convicted of first-degree murder in adult court.

## V.

■ Mitchell argues that the district court has the inherent authority to depart from mandatory sentences when necessary in the interests of justice. Generally, this court has said that district courts do not have the authority to depart from mandatory sentences. For example, in *State v. Jonason,* when a district court stayed a mandatory sentence, this court reversed the district court decision, stating that "[j]udicial sentencing must strictly adhere to statutory authorization." 292 N.W.2d 730, 733 (Minn. 1980). In sentencing, the legislature has the power to define the punishment for crimes, and the courts are the "executor of the legislative power." *State v. Osterloh,* 275 N.W.2d 578, 580 (Minn.1978).

■ At times, this court has recognized exceptions when the court does have inherent judicial power to act in the furtherance of justice, but this power is to be exercised only when there are special circumstances, such as selective or discriminatory prosecutorial intent. *State v. Krotzer,* 548 N.W.2d 252, 254–55 (Minn.1996). The inherent judicial power recognized in *Krotzer* is limited, and is to be "relied upon *sparingly* and only for the purpose of avoiding an injustice resulting from the prosecutor's *clear abuse of discretion* in the exercise of the charging function." *State v. Foss,* 556 N.W.2d 540, 541 (Minn.

1996) (emphasis in original). There is no allegation in this case of selective or discriminatory prosecution. Thus, the district court was correct in stating that it lacked the inherent judicial power to depart from the mandatory life sentence.

## VI.

■ Finally, Mitchell argues that the district court erred by refusing to give three of the jury instructions he requested. "The refusal to give a requested jury instruction lies within the discretion of the district court and no error results if no abuse of discretion is shown." *State v. Cole,* 542 N.W.2d 43, 50 (Minn.1996).

First, Mitchell requested that the court instruct the jury that "to convict, the circumstantial evidence must form a complete chain excluding any reasonable hypothesis of innocence." An almost identical instruction was requested and denied in *State v. Jones,* and this court explicitly concluded there was "no abuse of discretion in the trial court's failure to give the requested jury instructions." *State v. Jones,* 516 N.W.2d 545, 546 (Minn. 1994). We conclude that the court did not abuse its discretion by failing to grant Mitchell's requested instruction on circumstantial evidence.

■ Second, Mitchell requested that the court instruct the jury that to find Mitchell guilty of first-degree murder, it "must determine by proof beyond a reasonable doubt that Harley Hildenbrand did not shoot Mickey [Wilfert]." Mitchell's theory at trial was that Hildenbrand was the shooter. Mitchell argues, therefore, that this requested instruction went to his theory of the case, and, as such, he was entitled to an instruction on that theory. A party is entitled to a jury instruction to support his theory if evidence exists to support the theory, but if "the substance of a particular instruction is already contained in the court's instructions to the jury, the court is not required to give the requested instruction." *State v. Auchampach,* 540 N.W.2d 808, 816 (Minn.1995). While the court did not give the specific instruction requested by Mitchell, it did instruct the jury that the burden was on the state to prove all elements of the crime beyond a reasonable doubt. Further, the court specifically instructed the jury that it must

find that "Mitchell caused the death of Mickey [Wilfert]," and that it find he "acted with the intent to kill Mickey [Wilfert]." The court's instruction implicitly contained the notion that the jury had to find that Mitchell, not Hildenbrand, was the one who killed Wilfert. Therefore, the court did not abuse its discretion in failing to instruct the jury that it had to find that Hildenbrand did not shoot Wilfert.

Finally, Mitchell requested that the court instruct the jury that it had to find that he had the intent to kill "at the time the shot was fired" or "at the time the trigger was pulled." In its closing argument, the defense asserted that the jury should not consider the seconds after the shooting when the videotape shows Mitchell kicking at Wilfert. The court denied the requested instruction on intent, but instructed the jury that in order to convict Mitchell of first-degree murder, it must find that he intended to kill Wilfert, that he "acted with a purpose of causing death or believed that the act would have that result." The Minnesota Jury Instruction Guide suggests that a court use Minn.Stat. § 609.02, subd. 9 when defining intent for a jury. 10 Minn. Dist. Judges Ass'n, *Minnesota Practice*, CRIMJIG 7.10 (3d ed.1990). The court's instructions mirror Minn.Stat. § 609.02, subd. 9(3) (1994), which defines "intentionally" as meaning "that the actor either has a purpose to do the thing or cause the result specified or believes that the act performed by the actor, if successful, will cause that result." The court properly instructed the jury on intent, and therefore it did not abuse its discretion by denying Mitchell's request to narrow intent to the specific moment when the trigger was pulled.

Affirmed.

STRINGER, Justice (concurring specially).

I concur in the result reached by the majority.

GILBERT, J., took no part in the consideration or decision of this matter.