## In the Matter of the WELFARE OF U.S., Child.

No. C1–99–1820.

Court of Appeals of Minnesota.

June 27, 2000.

John M. Stuart, State Public Defender, Charlann Elizabeth Winking, Assistant State Public Defender, Minneapolis, for appellant U.S.

Mike Hatch, Attorney General, St. Paul, Boyd Beccue, Kandiyohi County Attorney, Nancy Kay Grussing, Assistant County Attorney, Willmar, for respondent county.

Considered and decided by
KALITOWSKI, Presiding Judge,
KLAPHAKE, Judge, and FOLEY, Judge.

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

## OPINION

DANIEL F. FOLEY, Judge*

U.S. appeals the district court's order certifying him to stand trial as an adult, claiming that there was insufficient evidence in the record to support adult certification. Because the evidence in the record supports the district court's conclusion that public safety would not be served by keeping U.S. within the juvenile system, we affirm.

## FACTS

During the early morning hours of July 2, 1999, U.S., Brian Thunstedt, and Billy Jo Fischer asked B.F. for a ride back to Fischer's house from a party. When they arrived at Fischer's house, Thunstedt, who was sitting in the front passenger seat, left the car and acted as if he was going to shake B.F.'s hand but instead punched B.F. There was no provocation by B.F. and no justification for the assault. All three then proceeded to attack and beat B.F. Robert Mattson, a neighbor, told the police that he heard one of the assailants say, "I'm going to get my 9mm and kill you." According to U.S., Fischer ran away and Thunstedt kept kicking B.F. U.S. claims that he was a passive participant and tried to stop Thunstedt when it looked like B.F. was seriously injured. B.F.'s car and wallet were stolen. Thunstedt and U.S. then took B.F., who was seriously injured, back to the party.

When B.F. returned to his apartment he was taken to the hospital where he was diagnosed as suffering contusions and abrasions, a concussion, and a broken facial bone. In addition, his eyes and ears were swollen shut, and the doctor concluded that he was one blow away from a cranial hemorrhage or skull fracture. In his victim impact statement, B.F. stated that he lost his ability to work that summer and that he and his family live in fear.

Minn. Const. art. VI, § 10.

U.S. was charged with assault in the second degree, pursuant to Minn.Stat. § 609.222, subd. 2 (1998), assault in the third degree, pursuant to Minn.Stat. § 609.223, subd. 1 (1998), terroristic threats, pursuant to Minn.Stat. § 609.713, subd. 1 (1998), and aggravated robbery in the first degree, pursuant to Minn.Stat. §§ 609.245, 609.05 (1998). The state sought certification of U.S. to adult court for these offenses.

Dr. Edmund Nadolny, a forensic psychologist, ran two psychological tests on U.S., which placed him

> at the seventh step of the nine-step risk assessment instrument. His score places him at the 93rd percentile, indicating that only seven percent of the reference sample (618 violent offenders) scored higher than he did. Thus, from a strictly actuarial standpoint, [U.S.] has a high score and is at considerably greater risk even in relation to other violent offenders. Base rate of violent offending for the reference sample was 31 percent within seven years. [U.S.]'s score would predict violent reoffending at 55 percent within seven years.

The second test showed that "although [U.S.] is a member of a high risk group, social conditions and substance abuse appear to be the primary person-specific markers." Dr. Nadolny further believes that although U.S. has been treated for substance abuse in the past, there has not been sufficient behavioral rehabilitation, which might address the social conditions and destabilizing influences in his life, such as negative peer influences and the substance abuse. As a result, Dr. Nadolny recommended against certification and in favor of extended juvenile jurisdiction (EJJ), believing that "juvenile options for management and rehabilitation have [not] been exhausted."

Dr. Nadolny recommended that U.S. enter the Prepare Program at Red Wing under EJJ, keeping him in the system until he is 21, while giving him the needed chemical dependency and behavioral rehabilitation needed. Dr. Nadolny also stated in his report that "[i]t is not clear that the weightier sentence of an adult conviction would serve either rehabilitation or public safety in this case." However, Dr. Nadolny acknowledged that with regard to public safety, U.S.'s risk of violent recidivism is high, with a 55 percent likelihood of violence within seven years and 64 percent risk within ten years.

Pat Boros, a probation officer who conducted the certification study, recommended certification. Boros contacted a larger group of people, including U.S.'s parents, the victim, his family, and various counselors of programs in which he has participated. Boros's report indicated that U.S.'s delinquency record consists of 11 incidents, including two felonies and two involving a firearm. U.S.'s first delinquent act took place in 1995, when he was 13. U.S. has violated his probation two times and, while he has participated in prior programming 13 different times, at least five of them were unsuccessful because he has either run away, been discharged for threatening his peers, or assaulted staff members. Boros based his decision that U.S. should be certified to stand trial as an adult on several factors, including: (1) the severe beating of B.F.; (2) U.S. has not responded positively to prior programming; (3) U.S. has a high risk of reoffending; and (4) no clear and convincing evidence exists to show that retaining him in the juvenile system will serve public safety. Accordingly, the district court certified U.S. to adult court and he appealed.

## ISSUE

Did the district court abuse its discretion in ordering certification to adult court?

## ANALYSIS

██ The district court has "considerable discretion" in determining whether a juvenile should be certified for adult prosecution. *In re Welfare of K.M.*, 544 N.W.2d

781, 784 (Minn.App.1996). A reviewing court will only reverse a juvenile certification if the district court's findings are clearly erroneous so as to constitute an abuse of discretion. *In re Welfare of S.J.G.*, 547 N.W.2d 456, 459 (Minn.App. 1996).

It is presumed that a proceeding involving an offense committed by a child will be certified if:

(1) the child was 16 or 17 years old at the time of the offense; and

(2) the delinquency petition alleges that the child committed an offense that would result in a presumptive commitment to prison under the sentencing guidelines and applicable statutes, * * *.

Minn.Stat. § 260.125, subd. 2a (1998). Because respondent was 17 at the time of the offenses, and two of the offenses with which he is charged would carry a presumptive prison sentence if U.S. were tried as an adult, his certification was presumptive. In order to rebut the presumption, U.S. had the burden of establishing, through clear and convincing evidence, that retaining the proceeding in the juvenile court serves public safety. *Id.*

█ The district court found that U.S. had not met his burden of proving that public safety would be served if he remained in the juvenile system, and therefore certified him to stand trial as an adult. U.S. claims that because the evidence in the record does not support this decision, the district court abused its discretion and this court should reverse.

█ In determining whether public safety is served by adult certification, the district court must consider the following statutory factors:

(1) the seriousness of the alleged offense in terms of community protection, including the existence of any aggravating factors recognized by the sentencing guidelines, the use of a firearm, and the impact on any victim;

(2) the culpability of the child in committing the alleged offense, including the level of the child's participation in planning and carrying out the offense and the existence of any mitigating factors recognized by the sentencing guidelines;

(3) the child's prior record of delinquency;

(4) the child's programming history, including the child's past willingness to participate meaningfully in available programming;

(5) the adequacy of the punishment or programming available in the juvenile justice system; and

(6) the dispositional options available for the child.

Minn.Stat. § 260.125, subd. 2b (1998). In considering these factors, greater weight must be given to the seriousness of the offense and the prior record of delinquency. *Id.; State v. Mitchell*, 577 N.W.2d 481, 489 (Minn.1998). For purposes of certification, the juvenile is presumed guilty of the alleged offenses. *K.M.*, 544 N.W.2d at 784.

*Seriousness of the Offense*

One factor the district court considers in determining the seriousness of the offense is whether there were any aggravating factors. Minn.Stat. § 260.125, subd. 2b(1) (1998). While U.S. acknowledges that the crimes charged were serious, he claims that the district court did not find any aggravating factors. We disagree. The district court found that the victim was treated with particular cruelty, which is an aggravating factor under the sentencing guidelines. Minn. Sent. Guidelines II. D.2.b.(2). The district court's findings provide that the attack was "vicious and unprovoked," and the victim was continually beaten even after he was on the ground and unable to move. In addition, the district court found that three individuals assaulted the victim, which is also an aggravating factor. Minn. Sent. Guidelines II. D.2.b.(8). While the district court might

not have specifically labeled them "aggravating factors," that does not lessen their impact when considering the seriousness of the offense.

When determining the seriousness of the crime, the district court also considers the impact on the victim. Minn.Stat. § 260.125, subd. 2b(1). The record shows that the physical and mental impact on the victim was severe. According to Dr. Peterson, B.F.'s physician, B.F. suffered a facial bone fracture, contusions and abrasions, a concussion, and "was within one blow or strike from sustaining a skull fracture or cranial hemorrhage." B.F.'s eyes and ears were swollen shut, and to this day he has numbing around his mouth and three teeth. He was unable to go to work for four days and now is distrustful of others.

This evidence indicates that the crime was severe, and this factor, which must be given greater weight under the statute, favors certification. Minn.Stat. § 260.125, subd. 2b; *Mitchell,* 577 N.W.2d at 489.

*Culpability*

U.S. claims that this factor does not favor certification because he was a passive participant in the beating and tried to stop Thunstedt from kicking B.F. U.S. claims this lessens his culpability. Minn. Sent. Guidelines II.D.2.a.(2). The district court found that U.S. readily joined in the attack and all three co-defendants were actively involved in the assault. While U.S. claims he tried to stop the beating, he did not do so until *after* he believed that B.F. was seriously injured. Because there is no evidence in the record to show these findings were clearly erroneous, this evidence indicates that U.S. was culpable and favors certification. *S.J.G.,* 547 N.W.2d at 459 (district court's decision to certify juvenile to adult court will not be reversed unless findings clearly erroneous).

*Prior Record of Delinquency*

The district court also found that U.S. had a "significant record" of prior delinquencies. U.S.'s record dates back to March 1995 and includes nine misdemeanors, two of which involved firearms. In addition, he has two felonies—theft and receipt of stolen goods. The district court did not abuse its discretion when it concluded that U.S. had a "significant record" of prior delinquencies. In light of this evidence, U.S.'s record of delinquency, which must be given greater weight, favors certification. Minn.Stat. § 260.125, subd. 2b; *Mitchell,* 577 N.W.2d at 489

*Prior Programming History*

██ U.S.'s programming history is extensive. According to the certification study, since August 1995, U.S. has participated in programs 13 separate times. While most of his programming has been for chemical dependency, some dealt with behavioral problems. Of the 13 programs, five were not successfully completed because: (1) U.S. was discharged from the Summit Oaks Center after assaulting a staff member; (2) he ran away from the Kandiyohi County Boy's Group Home and was arrested in Michigan for possessing a firearm; (3) he was discharged from Cardinal Recovery Relapse Program after failing to complete the 12–week program; (4) he was discharged to the Wright County Sheriff's Department from the Maple Lake Recovery Center for smoking marijuana and threatening to kill a peer if he reported him; and (5) he was discharged from On–Belay Halfway House for deteriorating behavior and lack of progress. Throughout this extensive prior programming, there is little evidence of meaningful participation. Rejection of prior treatment efforts indicates a juvenile's unwillingness to submit to programming in a meaningful way. *See In re Welfare of I.Q.S.,* 309 Minn. 78, 91, 244 N.W.2d 30, 40 (1976) (stating public safety served when juvenile certified to adult court after rejecting treatment). Therefore, U.S.'s programming history favors certification.

*Programming Available & Dispositional Options*

There are several dispositional options available for U.S. within the juvenile sys-

tem. Dr. Nadolny strongly believes that EJJ would be appropriate because U.S.'s problems are triggered primarily by "destabilizers" in his environment. Dr. Nadolny recommended the Prepare Program in Red Wing, which provides both chemical dependency and behavioral rehabilitation programs. In addition, it offers a transition into the community. However, if committed to this program, U.S. would be confined for only 12 months, which could be reduced to nine months for good behavior. Afterwards, he would be placed in a residential facility for 90 days and would be on probation until he turns 21.

The certification study discussed other programs that might be available to U.S. The Prairies Lakes Detention Center would hold U.S. for 12 months, but the optimum time frame would be six months. Because there are few programs in Minnesota, treatment facilities in nearby states, such as Woodfield Academy and Chamberlain Academy in South Dakota, and Grehill Academy in Iowa, were also considered during the certification study.

Woodfield Academy is an unlocked facility, which treats juveniles until they are 18, unless they obtain a waiver from the state. Chamberlain Academy is a minimum security facility, whose programs usually run six to nine months, but can last as long as six years. However, it too only houses students until they turn 18 unless they obtain a waiver from the state. Finally, Grehill Academy is a secured facility that would hold U.S. for two years or until he turns 19. Grehill operates chemical dependency programs, family programs, and on-site school or G.E.D. programming. Under this program, U.S. would be physically confined, at best, until he is 19, unless he obtains a waiver from the state.

While there are several potential programming options for U.S., the district court found the severity and violence of the offenses, as well as his emotional, behavioral, and chemical dependency difficulties, warrant a significant period of correctional detention. The district court concluded there was not enough time or adequate juvenile correctional and rehabilitative programs to rehabilitate U.S. in the time available in the facilities considered. Insufficient time for rehabilitation under the juvenile system is an appropriate consideration when deciding whether to refer the juvenile to adult court. *In re Welfare of R.D.W.*, 407 N.W.2d 113, 117 (Minn. App.1987), *review denied* (Minn. July 15, 1987). Moreover, because there is no evidence in the record indicating that these findings are clearly erroneous, they will not be reversed and the district court did not abuse its discretion in concluding that the dispositions available were inadequate. *See S.J.G.*, 547 N.W.2d at 459 (district court's decision to certify juvenile to adult court will not be reversed unless findings clearly erroneous).

### DECISION

We affirm the district court's conclusion that U.S. failed to rebut by clear and convincing evidence the presumption of certification. Considering all the evidence supporting certification, we find the district court did not abuse its discretion in certifying U.S. to adult court.

**Affirmed.**