544 N.W.2d 781 (1996)
In the MATTER OF the Welfare of K.M., Child.
No. CX-95-1533.
Court of Appeals of Minnesota.
March 12, 1996.
*782 John M. Stuart, State Public Defender, Charlann E. Winking, Assistant Public Defender, Minneapolis, for appellant K.M.
Ross Arneson, Blue Earth County Attorney, Mark A. Lindahl, Assistant County Attorney, Mankato, for respondent Blue Earth County.
Considered and decided by HUSPENI, P.J., and SCHUMACHER and FOLEY,[*] JJ.

OPINION
SCHUMACHER, Judge.
K.M., a juvenile, appeals from the district court's certification of him as an adult for various alleged criminal acts, arguing the district court erred in its decision that the public safety would not be served by retention of K.M. in the juvenile system. We affirm.

FACTS
K.M. is a 17-year-old juvenile male currently being held at the juvenile facility in Red Wing pending this appeal. At midnight on February 13, 1995, K.M. and an adult friend, Aaron Padgett, drove to the apartment of Jordan Jefferson. When they arrived, K.M. took a sawed-off shotgun, stepped out of the car, and fired one shot into the window of Jefferson's apartment. K.M. and Padgett then fled.
*783 Jefferson was slightly wounded from broken glass. Jefferson recognized the car as Padgett's. Padgett was arrested by the police, admitted driving the car, said that K.M. was the one who fired the shotgun, and handed the alleged weapon to the police.
K.M. was arrested and charged as a delinquent child with second-degree assault, first-degree criminal damage to property, operating a short-barrel shotgun, and drive-by shooting. The prosecutor moved to have K.M. certified as an adult. At the probable cause pretrial hearing, the juvenile court determined there was probable cause on all four counts and ordered a certification hearing, a psychological evaluation, and a reference study.
The evaluation and reference study detailed K.M.'s past. K.M. was born in 1978 in Cambodia, where his father was killed by the Khmer Rouge. K.M.'s three older siblings died of hunger caused by the fighting. K.M. and his mother lived in a refugee camp in Thailand for six years until they were sponsored by U.S. relatives and moved to Rochester in 1985. During his stay in the camp, K.M. witnessed extreme violence, including numerous murders and rapes.
K.M. and his mother lived in Rochester for one year before moving to Long Beach, California. For the next three years, K.M. admitted to heavy gang activity and occasional participation in violent gang behavior. They then moved to the Boston, Massachusetts area after K.M.'s life was threatened by gangs in California. K.M. admitted participation in gang activity and gang violence in Massachusetts for the next two years. K.M. and his mother moved to Mankato in 1992 because K.M.'s life was again in danger.
Since moving to Mankato, K.M. has been an active member of the "Cambodian Bloods" gang. K.M. considered himself one of the leaders and maintained contacts with groups in Rochester and Minneapolis. K.M. has admitted to unspecified illegal and violent acts for which he has not been charged. He also has admitted to extensive marijuana and alcohol use for a number of years.
K.M.'s prior court record and exposure to programming is minimal. In 1993, he admitted a CHIPS petition for truancy and was placed on 90 days intensive supervision. He successfully completed the program. In 1994, K.M. was involved in a gang-related fight at school and was suspended. K.M. participated in Home Bound tutoring for several weeks. On return to school, a good-behavior contract was signed with the school. K.M. breached the contract and was suspended for gang graffiti and skipping classes. The school subsequently asked K.M. not to return and organized outside tutors for him. K.M. did not participate in the tutoring and has had no formal schooling since 1994. In the fall of 1994, the Children's Project of Mankato worked with K.M. to find him a job. K.M. met a few times with a caseworker but then refused to cooperate further. K.M. has also admitted to fifth-degree assault on September 15, 1994. In that instance K.M. broke another male's nose and jaw.
The reference study analyzed six statutory factors in concluding that retention of K.M. in the juvenile system would not serve the public safety. The study recommended that K.M. be certified as an adult because he completely identifies his life with gangs and has a history of gang-related violence that juvenile programming could not help.
Prior to the certification hearing, K.M. showed some social improvement at Red Wing after initial gang-related behavior. K.M. also showed progress in school while at Red Wing. K.M., however, was later placed in a secured area for engaging in gang-related behavior.
At the hearing, K.M. presented the testimony of three people associated with the Red Wing facility, who all testified that the juvenile system was a better environment for K.M. because he had shown improvement at Red Wing. Only one could testify, however, that the public safety was served by retention at Red Wing. In rebuttal, the county presented testimony from the author of the reference report and a psychologist. The county's witnesses testified that retention of K.M. would not serve the public safety because of his total identification with gangs and history of gang-related violence.
The juvenile court analyzed the applicable six statutory factors to determine whether *784 K.M. had rebutted the presumption of adult certification by clear and convincing evidence. The court concluded that K.M. had not rebutted the presumption because
the alleged offense [was] extremely serious in that it involved the use of a firearm and had a potential for death or serious injury. Although [K.M.]'s juvenile record includes only a misdemeanor assault charge, [K.M.] has reported that he has spent seven years involved in violent gang behavior. For these reasons, it will not serve the public safety to retain these proceedings in juvenile court.
K.M. appeals.

ISSUE
Did the juvenile court abuse its discretion in concluding that K.M. had failed to rebut the presumption of adult certification by clear and convincing evidence that the public safety would be served by his retention in the juvenile court?

ANALYSIS
In juvenile certification proceedings, a juvenile court has considerable discretion in determining if adult certification will be made, and its decision will not be reversed absent an abuse of that discretion. In re Welfare of S.W.N., 541 N.W.2d 14, 16 (Minn. App.1995), review denied (Minn. Feb. 9, 1996). For purposes of reference hearings, the charges against the juvenile are presumed to be true. Id.
The juvenile court may order adult certification if the court finds that the child is presumptively certified and that the child has not rebutted the presumption by clear and convincing evidence that retaining the child in the juvenile court serves the public safety. Minn.Stat. § 260.125, subd. 2(6)(i) (Supp. 1995). A juvenile is presumptively certified if (1) the child was 16 or 17 at the time of the offense, and (2) either the child used a firearm in committing a felony offense or the offense is one that would result in presumptive commitment under the sentencing guidelines. Id., subd. 2a (Supp.1995).
The juvenile court considers six factors in determining whether the public safety is served by certifying the child:
(1) the seriousness of the alleged offense in terms of community protection, including the existence of any aggravating factors recognized by the sentencing guidelines, the use of a firearm, and the impact on any victim;
(2) the culpability of the child in committing the alleged offense, including the level of the child's participation in planning and carrying out the offense and the existence of any mitigating factors recognized by the sentencing guidelines;
(3) the child's prior record of delinquency;
(4) the child's programming history, including the child's past willingness to participate meaningfully in available programming;
(5) the adequacy of the punishment or programming available in the juvenile justice system; and
(6) the dispositional options available for the child.
Id., subd. 2b (Supp.1995). In considering whether public safety is served by retention in the juvenile system,
the court shall give greater weight to the seriousness of the alleged offense and the child's prior record of delinquency than to the other factors.
Id.
The parties do not dispute that K.M. clearly falls under the presumption of certification. He was 16, used a sawed-off shotgun, and his alleged crimes would result in a presumptive commitment under the sentencing guidelines. K.M. instead argues the juvenile court improperly balanced the six statutory factors. We address each statutory factor in order.
Seriousness of Offenses. K.M. argues that the first factor should not be considered as strongly because even the victim does not want K.M. to go to prison. We disagree. While impact on the victim is a consideration, there is evidence that the victim was evicted from the apartment and has had a difficult time locating alternative housing because of the shooting. There is also no question the offenses are very serious and that a firearm *785 was used. K.M.'s alleged acts could have resulted in death or serious injury. The juvenile court, therefore, did not abuse its discretion in giving the seriousness of K.M.'s offenses the weight required by the statute.
Culpability. K.M. does not dispute this element. Taking the allegations as true, K.M. planned and carried out the drive-by shooting using a sawed-off shotgun. The court found there were no mitigating factors, and the evidence supports the court's decision.
Prior Record of Delinquency. K.M.'s prior record of delinquency is limited to a misdemeanor fifth-degree assault conviction. K.M. argues, however, that the juvenile court erred in using K.M.'s prior gang-related activity in conjunction with his minimal juvenile record to support certification. We disagree. The evidence shows the assault was for a gang-related fight. Evidence of K.M.'s prior gang-related behavior was applicable to several factors, including his programming history, adequacy of punishment available, and dispositional options available. The juvenile court did not abuse its discretion in using K.M.'s prior gang-related behavior in conjunction with his prior record and the seriousness of the offenses.
Programming History. K.M. argues that his lack of programming history should not be used against him. There was evidence, however, that K.M. failed to participate in other programming, such as the good-behavior contract with the school, tutoring after expulsion, and the Children's Fund job search. In addition, there was evidence that K.M.'s gang-related behavior and his self-proclaimed dangerousness because of his affiliation with gangs would cause trouble for any programming made available to him. In fact, K.M. was placed in the secured area of Red Wing for gang-related behavior. Both of the psychologists reported that K.M.'s whole identity was connected to gangs and that any rehabilitation would be difficult. All of this evidence was considered by the juvenile court and specifically mentioned in its findings. It was within the court's discretion to decide whether K.M. would be helped by retention in the juvenile system based on this evidence. The court decided he would not and the evidence supports that conclusion.
Adequacy of Punishment or Programming. The experts disputed whether K.M. would be adequately treated in the juvenile system. The juvenile court stated that the adequacy of the juvenile system to punish or program K.M. was limited because of his long history of violent, gang-related activity. The evidence suggests that K.M. might be a danger to the public safety because his identity is caught up in his gang affiliations and he has been violent in the past. Where the experts' testimony is at issue, we defer to the juvenile court's credibility determinations. In re Welfare of M.D.O., 462 N.W.2d 370, 374-75 (Minn.1990).
Dispositional Options. The juvenile court noted there were two secure facilities and two unsecure facilities willing to consider K.M., but that his lengthy gang affiliations would not allow for successful treatment in the juvenile system. The record shows the experts disputed whether these were viable options. The court credited the county's witnesses and that exercise of discretion will not be disturbed.
Considering the broad discretion accorded the juvenile court, we cannot say on this record that the court abused its discretion in concluding K.M. failed to rebut the presumption of adult certification.
K.M. argues that the juvenile court failed to consider the possibility of an extended juvenile jurisdiction designation for K.M. We disagree. The court analyzed the six factors to
determine whether it would serve the public safety to certify the case to district court or retain the proceedings under extended juvenile jurisdiction.
(Emphasis added.) The district court did not abuse its discretion by not specifically addressing extended juvenile jurisdiction retention as an alternative because it only results if K.M. successfully rebuts the presumptive certification. See Minn.Stat. § 260.125, subd. 5 (Supp.1995).

*786 DECISION
The juvenile court did not abuse its discretion in concluding that K.M. failed to rebut the presumption of adult certification by clear and convincing evidence that retaining K.M. in the juvenile court serves the public safety. Accordingly, we affirm the juvenile court order certifying K.M. under Minn.Stat. § 260.125, subd. 2a.
Affirmed.
NOTES
[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.