In re ST. LOUIS COUNTY,
petitioner, Appellant,

v.

S.D.S., Respondent.

No. C9–99–981.

Court of Appeals of Minnesota.

March 7, 2000.

Alan L. Mitchell, St. Louis County Attorney, Leslie E. Beiers, Assistant County Attorney, Duluth, MN (for appellant).

John M. Stuart, State Public Defender, Charlann Elizabeth Winking, Assistant State Public Defender, Minneapolis, MN (for respondent).

Considered and decided by TOUSSAINT, Chief Judge, SHUMAKER, Judge, and FOLEY, Judge.

\* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

## OPINION

DANIEL F. FOLEY,\* Judge.

Respondent was charged with two armed robberies for the benefit of a gang. Appellant St. Louis County appeals from a trial court order denying certification to adult court. Because the trial court did not place the proper weight on the seriousness of respondent's alleged crimes and his prior record of delinquency in balancing the factors for certification set forth in Minn.Stat. § 260.125, subd. 2b (1998), we reverse with directions to certify.

## FACTS

The state alleges that on January 22, 1999, 17–year–old respondent S.D.S. entered the Dee Independent Cleaners with two other individuals and robbed it at gunpoint. Respondent allegedly threatened the clerk with a gun. The clerk described the incident as frightening and reported difficulties in concentration, disruption of her studies, and nightmares. The state alleges that on January 30 respondent and two other individuals entered the Whole Foods Co-op and robbed it at gunpoint. The clerk, who was held at gunpoint, stated that she thought she was going to die.

Respondent is a confirmed gang member. The Minnesota Gang Strike Force has several gang profiles on him, he has admitted gang membership, and he has been arrested in the company of known gang members. The record indicates that for the last three to four years respondent has been a member of two violent gangs, the Gangster Disciples and the Dog Pound Gangsters.

Respondent also has a delinquency record. On February 24, 1998, while in the presence of a fellow gang member armed with a knife, respondent punched a victim in the face. On May 8 a fellow gang member assaulted a victim with a fence post while respondent closed the car door,

Minn. Const. art. VI, § 10.

preventing a passenger who was with the victim from getting out. In both incidents respondent was adjudicated delinquent for fifth-degree assault. Respondent was adjudicated delinquent for obstructing legal process in a case involving physical interference with the police who were detaining a fellow gang member. Respondent was also adjudicated for criminal damage to property for vandalizing school property with gang graffiti. At the time of the certification hearing, there was also a pending disorderly conduct case.

From June 9, 1998 until December 1998, respondent was on probation. His probation officer, Dan Bartlett, stated that respondent did not normally check in with him or attend the Violence Prevention Group, which was a condition of his probation. Because Bartlett believed that respondent was living a lifestyle with very little supervision and needed to be in a secure setting, he recommended certification.

As part of his probation, respondent was placed at the Chisholm House. While there, he violated some of the program expectations, challenged authority, minimized the seriousness of his placement, demonstrated negative peer relationships, and showed little remorse for his actions. Despite the fact that respondent finished the program, he was seen as a high risk for further court involvement. In addition, efforts by his high school principal, counselors, and teachers to encourage him to attend school and perform well were unsuccessful.

At respondent's April 29, 1999 certification hearing, testimony was heard regarding three juvenile residential treatment programs that would accept him. Christopher Corsbie, Admission Coordinator for Glen Mills, interviewed respondent and found him appropriate for their program. Glen Mills is a non-secure, confrontation-group setting involving academics, vocational education, and sports. This program has an average length of stay ranging from 12 to 18 months and a recidivism rate of 50 percent after 27 months.

Larry Weight, Director of Clinical and Support Services for the Bar None program, also testified that respondent was appropriate for their program. At the Bar None program, which is a cognitive behavioral program, consequences for misbehavior include time outs, dropping levels, lock downs, and administrative segregation. The average stay is 11.1 months and the recidivism rate is 33 percent. Bar None provides no vocational programs. Finally, John Handy, Program Director for the Minnesota State Department of Corrections at Red Wing, stated that a juvenile commitment to the Commissioner of Corrections is automatically accepted to the Red Wing Program. Red Wing, a secure facility, uses the Equip model of reasoning, which is designed to address cognitive distortions, moral reasoning deficiency, and social skills. There is an education and vocational component to the program. The average length of stay at Red Wing is one year, followed by a 90–day extended furlough to the community. The 1995 Legislative Auditor's report on juvenile recidivism showed a rate of 71 percent after two years and 87 percent after five years. A resident placed as an extended jurisdiction juvenile (EJJ) can remain at Red Wing until the age of 21.

While none of the program witnesses provided a recommendation for or against certification, several expert witnesses testified as to this issue at the certification hearing. Dr. Owen Nelson, a forensic psychologist, examined respondent and concluded that based on his moral and religious values, his conduct disorder was treatable. While Dr. Nelson believed that respondent would benefit from a peer-type program and public safety would be served by keeping him in the juvenile system, he could not guarantee a successful outcome in the juvenile system. Dr. Nelson also indicated that public safety would be protected when respondent was locked up, although he recommended against certifi-

cation. Dr. Nelson's recommendation against certification was based on respondent's amenability to treatment and the availability of treatment in the juvenile system.

Jeff Rasmussen, Hennepin County Public Defender's Office Dispositional Advisor, believed that respondent was appropriate for EJJ and that public safety would be served by keeping him in the juvenile system. Rasmussen did not view respondent's prior delinquent record as violent and believed that because he has three and one-half years remaining in the juvenile system, there are appropriate programs to treat him.

Dr. Charles Orsak of the Human Development Center found an increased risk for ongoing and worsening behavior problems based upon the existence of both overt and covert behavior, the overall severity of respondent's behavior, and the fact that his behavior problems were occurring in multiple settings. Dr. Orsak did not see respondent as a viable candidate for residential programs and recommended a secure setting. He noted that respondent has a notable lack of anxiety, tenuous connection with important institutions such as family, community, and school, and his identity was focused on gang allegiance.

Finally, David Newman, who conducted the certification study and was respondent's probation officer from October until December 1998, recommended certification. While he testified that respondent complied with his probation, he noted that respondent valued the gang above his family. Newman indicated that respondent did not show a willingness to participate meaningfully in treatment. He did not believe that there was sufficient time remaining before age 21 for the juvenile system to protect public safety and further believed that the Red Wing and Glen Mills Program, where he had placed juveniles in the past, were not appropriate facilities for respondent. Newman based his opinion

on the length of the programs, the lack of secure facilities, and respondent's deeply rooted gang values.

On June 2, 1999, the trial court denied the state's motion for certification. St. Louis County appealed, and the appeal was heard on October 8, 1999, but was dismissed by this court as moot in an order filed on November 2, upon the representation of counsel that respondent had agreed to waive certification. Upon the state's submission of documents from the district court proceedings establishing that respondent had withdrawn his declared intent to waive certification, this court reinstated the appeal on January 11, 2000.

## ISSUE

Did the trial court abuse its discretion in denying certification?

## ANALYSIS

The district court has "considerable discretion" in determining whether a juvenile should be certified for adult prosecution. *In re Welfare of K.M.*, 544 N.W.2d 781, 784 (Minn.App.1996). This court will not reverse a juvenile certification order unless the district court's findings are clearly erroneous so as to constitute an abuse of discretion. *In re Welfare of S.J.G.*, 547 N.W.2d 456, 459 (Minn.App. 1996), *review denied* (Minn. Aug. 6, 1996).

It is presumed that a proceeding involving an offense committed by a child will be certified if:

(1) the child was 16 or 17 years old at the time of the offense; and

(2) the delinquency petition alleges that the child committed an offense that would result in a presumptive commitment to prison under the sentencing guidelines and applicable statutes, * * *.

Minn.Stat. § 260.125, subd. 2a (1998).[1] Because respondent was 17 years old at

---

1. Recodified as Minn.Stat. § 260B.125, subd. 3, as of August 1, 1999. *See* 1999 Minn. Laws ch. 139, art. 2, § 11 (enacting § 260B.125), art. 4, § 3 (repealing § 260.125); Minn.Stat.

the time of the offenses and the offenses with which he is charged carry a presumptive executed sentence, his certification was presumptive.

■ To rebut the presumption of certification, a respondent must establish, through clear and convincing evidence, that retaining the proceeding in the juvenile court serves public safety. *Id.* In determining whether public safety is served, the district court must consider the following statutory factors:

(1) the seriousness of the alleged offense in terms of community protection, including the existence of any aggravating factors recognized by the sentencing guidelines, the use of a firearm, and the impact on any victim;

(2) the culpability of the child in committing the alleged offense, including the level of the child's participation in planning and carrying out the offense and the existence of any mitigating factors recognized by the sentencing guidelines;

(3) the child's prior record of delinquency;

(4) the child's programming history, including the child's past willingness to participate meaningfully in available programming;

(5) the adequacy of the punishment or programming available in the juvenile justice system; and

(6) the dispositional options available for the child.

Minn.Stat. § 260.125, subd. 2b (1998). In considering these factors, greater weight must be given to the seriousness of the alleged offense and the prior record of delinquency than to the other factors. Minn.Stat. § 260.125, subd. 2b; *State v. Mitchell*, 577 N.W.2d 481, 489 (Minn.1998).

The parties do not dispute that respondent falls within the presumption of certification. However, the state argues that the trial court improperly balanced the six statutory factors by not placing appropriate weight on the seriousness of respondent's alleged offenses and prior record of delinquency. We agree.

*Seriousness of Offense*

■ We repeat—Minnesota law requires that greater weight be given to the seriousness of the alleged offense factor. Minn.Stat. § 260.125, subd. 2b; *Mitchell*, 577 N.W.2d at 489. Here, the trial court understated and failed to weigh properly facts that demonstrated the seriousness of respondent's alleged offenses.

The district court stated that while "the offenses are serious," the prison term was relatively short, and "the victims were frightened, while not physically harmed." However, the record demonstrates that the alleged offenses were much more serious than the trial court concluded. Respondent allegedly committed two gang-related armed robberies within a nine-day span. The clerks were held at gunpoint, and one of the clerks described not only a fear of dying, but also ongoing struggles with day-to-day activities, nightmares, nervousness, and difficulty concentrating. The other clerk reported disruption in her studies and nightmares. While the victims might not have suffered physical injuries, the record establishes that each was terrorized.

Because the trial court did not place the proper weight on the seriousness of the alleged offenses, it abused its discretion in balancing the statutory factors.

*Culpability of the Child*

The degree of respondent's alleged culpability is not in dispute. The district court noted that "the juvenile's culpability is given, as he was one of the primary participants, and brandished the weapon."

*Prior Record of Delinquency*

■ The state also argues that the district court did not apply the proper weight

§ 645.02 (1998) (laws passed by legislature take effect Aug. 1 of that year unless otherwise specified in law).

to respondent's delinquency record. We agree. Minnesota law requires that greater weight also be given to the juvenile's prior delinquency record. Minn.Stat. § 260.125, subd. 2b; *Mitchell,* 577 N.W.2d at 489. The trial court found that respondent's prior record of delinquency was "minimal," noting that it contains only misdemeanors. However, respondent committed four misdemeanors, all gang related. The assault on February 24, 1998, took place in the presence of a known gang member who was armed with a knife. There, respondent punched the victim in the face, for which he was adjudicated delinquent for fifth-degree assault. During the May 8, 1998 assault, respondent was also accompanied by a known gang member, who assaulted the victim with a fence post while respondent held the door of the car, preventing the passenger from getting out. Respondent was also adjudicated delinquent for obstructing legal process in a case involving physical interference with the police, who were detaining a fellow gang member. Finally, respondent was adjudicated delinquent for criminal damage to property when he sprayed gang graffiti on the outer surface of a high school, causing thousands of dollars in damage. In addition, the fact that respondent's prior record of delinquency included only four misdemeanor convictions does not lessen its weight. This court has affirmed the trial court's decision to certify a juvenile when his prior juvenile history included one gang-related misdemeanor. *See K.M.,* 544 N.W.2d at 785 (holding gang-related nature of misdemeanor applicable to weighing factors). Here, where respondent has four gang-related misdemeanors on his record, his prior delinquency record weighs in favor of certification.

Because respondent had been convicted of repeated gang-related misdemeanors, his prior delinquency record was far from "minimal." By not recognizing the gang-related nature of all his prior offenses, the trial court understated his prior delinquency record, a factor that the law clearly requires be given greater weight. Because the trial court failed to do this, we conclude that it abused its discretion in balancing the factors and denying certification.

*Child's Programming History*

The trial court also determined that the programming history was minimal, with very little treatment involved. However, the record indicates that respondent was involved in mediation, out-of-home placement, supervised probation, and compulsory attendance at a violence prevention group. There was testimony at trial that the school efforts to help respondent were unsuccessful. In addition, the court accepted a recommendation letter written by Peter J. Kennelly, a Treatment Team Manager at Chisholm House, which states that while at Chisholm House, S.D.S.

> [h]ad a carefree demeanor and did not hesitate to violate many basic program expectations. When held accountable for his behavior, [he] verbally challenged authority and acted as if he was "above" the rules. * * * As his sentence progressed [S.D.S.] began to conform and his acting out became less blatant. Although he was making "good time" on a more consistent basis, [S.D.S.'s] reaction when held accountable remained consistent through his sentence. He was defensive to both staff and his peer group. [He] displayed all of the abilities to succeed in the program. Unfortunately, he chose to minimize the seriousness of this placement and he put forth minimal effort. His completion of the program in twenty-four days then, can be considered satisfactory at best by our standards.

The record further indicates that "[h]e showed little remorse for his crimes and was unwilling to accept advice on his hurtful values and behaviors."

While respondent's most recent probation officer testified that he complied with his probation, a prior probation officer testified that respondent did not formally check in with him. In addition,

respondent did not attend the Violence Prevention Group because it conflicted with his work schedule, even though it was a condition of his probation. The district court's order did not address these issues and concluded that respondent's programming history was "minimal." Because the record clearly shows that respondent has an *extensive* programming history, we conclude that the district court's determination that the history was "minimal" was clearly erroneous.

### Adequacy of Punishment or Programming Available

 The experts disputed whether respondent would be adequately treated in the juvenile system. Five expert witnesses testified regarding whether respondent should be certified. Dr. Nelson believed that respondent should be kept within the juvenile system because his religious beliefs suggested his conduct disorder was treatable. Jeff Rasmussen believed that there were programs that would be appropriate for respondent and that there was sufficient time, three and one-half years, remaining in the juvenile system to treat him. In contrast, Dr. Orsak, and probation officers Dan Bartlett and David Newman, recommended that respondent be certified. Dr. Orsak found an increased risk for ongoing behavior and did not believe that respondent was amenable to treatment. Bartlett based his determination in favor of certification on the severity of the charges and respondent's past history. Newman believed that respondent had insufficient time remaining in the juvenile system to protect public safety. Ordinarily, where expert testimony conflicts, this court will defer to the trial court's credibility determination. *K.M.,* 544 N.W.2d at 785 (citing *In re Welfare of M.D.O.,* 462 N.W.2d 370, 374–75 (Minn.1990)). However, in this case the evidence dictates a different result when the factors are properly weighed. The long-established rule in Minnesota provides that "[f]indings which are controlled or influenced by errors of law are not final

on appeal and may be set aside." *Honn v. Coin & Stamp Gallery, Inc.,* 407 N.W.2d 419, 422 (Minn.App.1987), *review denied* (Minn. Aug. 12, 1987).

### Dispositional Options

Here, there is no dispute that there were disposition options for respondent, given that three different programs had interviewed and were willing to accept him. However, these options are outweighed by the seriousness of respondent's alleged offenses and his prior delinquency record, which must be given greater weight and which, when considered in light of the factors, favor certification.

We cannot emphasize too strongly that the trial court must place greater weight on the severity of the alleged crime and the prior delinquency record of the juvenile in deciding whether to certify. *Mitchell,* 577 N.W.2d at 489.

## DECISION

 The trial court abused its discretion, placing extra emphasis on respondent's programming history and dispositional options and ignoring facts that clearly indicated that respondent's alleged offenses were serious and his prior delinquency record extensive. The greater weight that must be placed on these two factors not only outweighs all the other factors, but also favors certification.

**Reversed.**