In the Matter of the WELFARE OF P.C.T.

No. A12–0895.

Court of Appeals of Minnesota.

Dec. 3, 2012.

Lori Swanson, Attorney General, St. Paul, MN; and Michael O. Freeman, Hennepin County Attorney, Lee W. Barry, Assistant County Attorney, Minneapolis, MN, for appellant State of Minnesota.

Mark D. Nyvold, Special Assistant State Public Defender, Fridley, MN, for respondent P.C.T.

Considered and decided by SCHELLHAS, Presiding Judge; KIRK, Judge; and HARTEN, Judge.[*]

## OPINION

KIRK, Judge.

Appellant State of Minnesota challenges the district court's denial of presumptive adult certification of respondent P.C.T., who faces six counts of aiding and abetting second-degree attempted murder for the benefit of a gang arising from three separate behavioral incidents. The state argues that the district court incorrectly found that respondent's programming history weighs against adult certification. It also argues that the district court did not give sufficient weight to the first and third public-safety factors set out in Minn.Stat. § 260B.125, subd. 4. Finally, the state contends that the district court improperly emphasized the likely rehabilitation of respondent if he is retained in the juvenile justice system over the public-safety benefits of certifying respondent to be tried as an adult. Because we find that the district court abused its discretion when it found respondent had shown by clear and con-

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

vincing evidence that his programming history, the adequacy of future programming, and the available dispositional options in the juvenile justice system did not favor adult certification, and when it failed to give sufficient weight to the first and third public-safety factors, we reverse and remand.

## FACTS

■ "For purposes of certification, the juvenile is presumed guilty of the alleged offenses." *In re Welfare of S.J.T.*, 736 N.W.2d 341, 346 (Minn.App.2007), *review denied* (Minn. Oct. 24, 2007). Respondent, a 16–year–old at the time of the incidents giving rise to this appeal, is accused with two others of being involved in a series of drive-by shootings in Minneapolis, and respondent was identified as the shooter in at least one of the incidents. The first shooting occurred at about 5:30 p.m. on March 5, 2012. The victim was with some friends near 21st and Lyndale Avenues North when a black Ford Crown Victoria drove past and then made a U-turn. The victim got in her car and drove off. She looked in her rearview mirror and saw a black male shooting out of the window of the front passenger seat of the Crown Victoria. One of the bullets struck the victim in the foot.

The second shooting occurred about two hours later. The driver of a white Buick and his two passengers drove by a filling station near West Broadway Avenue and Penn Avenue North. The driver noticed a black Crown Victoria leave the filling station and begin to follow his car. The driver then heard gunshots and realized that they were coming from the car that was pursuing him. He suffered a gunshot wound to the neck.

The third shooting occurred that same day, shortly before 11 p.m. Police were dispatched to investigate a report of shots being fired near 25th and Dupont Avenues North. They stopped a green Chevrolet Suburban that had been reported fleeing the scene at a high rate of speed. The Suburban had four bullet holes in the driver's door, and a subsequent examination discovered two intact bullets and several bullet fragments inside the vehicle. None of the vehicle's three occupants were injured. The occupants described seeing a black Crown Victoria drive by, with the shooter hanging out of the window firing shots at their vehicle. They told police they could probably identify the shooter and reported that the same Crown Victoria had been involved in a number of shootings in the area.

Shortly after 11 p.m., officers observed a black Ford Crown Victoria matching the description of the one involved in the shootings that night. They pursued the vehicle for several blocks with their emergency lights and sirens turned on, but the Crown Victoria sped away and police were unable to keep up with it in traffic. They found the car several blocks later, but it had been abandoned. Using vehicle records, witness identification, and surveillance video, police identified respondent as the shooter. In a taped, post-*Miranda* statement, respondent denied having been in a vehicle on the day of the shootings. The police searched respondent's bedroom and found a baseball cap matching the one worn by one of the suspects filmed by the surveillance camera at the filling station shortly before the second shooting occurred.

This was not respondent's first incident involving guns. In May 2009, respondent allegedly went to his school in St. Louis Park carrying a BB gun in his backpack. Charges were later dismissed, but respondent left the school district. In June 2011, Minneapolis police responded to a report of shots being fired. They pursued re-

spondent on his bicycle and observed him toss something in the bushes, which the police discovered to be a loaded semiautomatic pistol with the hammer engaged in firing position. The serial number of the pistol had been filed off.

Respondent was adjudicated delinquent of a felony involving a firearm, and he was placed on supervised probation and ordered by the district court to participate in the Gun Offender Program. He completed the classroom portion of the gun program but did not complete the community service requirement. He was then placed on electronic home monitoring and ordered to attend the Evening Reporting Center Program. His attendance at the reporting center was sporadic at first, but staff told him that he would be suspended if his attendance did not improve. Respondent's attendance improved for about two months, and then he was placed on a two-week administrative hold to spend time with his girlfriend and their newborn baby. His attendance never returned to acceptable levels after that. He violated the terms of his probation by failing to attend school, remain law abiding, and complete the court-ordered programming.

School records indicate that respondent has been suspended from school, has been verbally defiant, and has gotten into fights. He failed to attend school or online school programming between September 2011 and the date of these offenses, March 5, 2012. While being held on the current charges, he has performed well at the school inside the juvenile detention center, but he was the subject of an incident report at that school when he was overheard using gang-related terms.

In September 2011, respondent witnessed the murder of his cousin. Police knew that some of the victims of all three of the March 5 shootings were associated with YNT, the Taliban, or other rival gangs to the Skitz Squad, a group that respondent formed and led following the murder of his cousin. Respondent claims that Skitz Squad is a music group, although the state believes that the group is engaged in gang activity. Following the March 5 shootings, the state charged respondent with six counts of aiding and abetting second-degree attempted murder for the benefit of a gang, in violation of Minn.Stat. §§ 609.05, .11, .17, .19, subd. 1(1), .229, subds. 2, 3(a), 4(b) (2010). The state moved for presumptive adult certification pursuant to Minn.Stat. § 260B.125, subd. 3 (2010).

The district court ordered a certification study and a psychological evaluation of respondent. On May 10, 2012, the district court held a certification hearing wherein it heard testimony from a defense witness, Hennepin County probation officer Susan Bach, who prepared the certification study. The state did not present any witnesses or submit any documentary evidence.

In her study, Bach weighed the six statutory factors enumerated in Minn.Stat. § 260B.125, subd. 4, and recommended that the court designate respondent an extended jurisdiction juvenile (EJJ). Bach testified that respondent had previously shown signs of successful behavioral modification in court-ordered programming affiliated with past delinquent conduct, but that such behaviors fell away when he returned to his community of origin. Bach noted that, as the investigating probation officer, she would not recommend community-based corrective programming for respondent, but would consider locked residential placements in Red Wing, Duluth, and Nevada. Bach also testified that "there would be, I believe, approximately 58 months of time that the Court could have jurisdiction over the matter ... I felt that the factors taken in whole weighs in favor of EJJ for [P.C.T.]."

Bruce Renken, a licensed psychologist who prepared a psychological evaluation of respondent at the direction of the district court, diagnosed respondent with antisocial behavior of adolescence and adjustment disorder with depressed mood, arising in part from psychological stresses associated with the recent, violent death of his cousin that respondent witnessed, respondent's current legal stresses, the violent deaths of both his parents, and the recent birth of his child. Renken opined that respondent was at a high risk for future serious violence but found respondent would benefit from intensive residential placement in a correctionally oriented facility that emphasizes the development of prosocial and vocational skills, and provides opportunities to interact with prosocial adult role models separated from antisocial influences. Renken further found that, following residential treatment, respondent should enter into a long period of intensely supervised probation and community-based programming. Renken concluded that it is reasonable to expect that respondent's risk of violence would be significantly lowered if these services were provided for at least three years.

The district court weighed the six factors of Minn.Stat. § 260B.125, subd. 4, and concluded that retaining the matter in juvenile court serves public safety because (1) respondent would benefit from EJJ probation and his risk to reoffend would be significantly reduced, (2) adequate punishment and programming is available in the juvenile justice system, and (3) respondent would benefit from his removal from the community and the negative influences contributing to his criminal conduct. The district court concluded that respondent "demonstrated by clear and convincing evidence that retaining the proceedings in juvenile court serves public safety." The state appeals.

## ISSUE

Did the district court commit clear error so as to be an abuse of discretion when it denied the state's motion for adult certification?

## ANALYSIS

■ "A district court has considerable latitude in deciding whether to certify a case for adult prosecution. Its decision will not be reversed unless [the court's] findings are clearly erroneous so as to constitute an abuse of discretion." *In re Welfare of D.T.H.,* 572 N.W.2d 742, 744 (Minn.App.1997) (quotations omitted), *review denied* (Minn. Feb. 19, 1998).

In presumptive-certification proceedings, the state bears the burden of showing that (1) the juvenile was 16 or 17 years old, and (2) the alleged offense carries a presumptive prison sentence or that it is a felony offense involving a firearm. Minn. Stat. § 260B.125, subd. 3; *see also In re Welfare of L.M.,* 719 N.W.2d 708, 710 (Minn.App.2006). Neither party disputes that the state met its burden on these points.

Once the state's burden is met, the juvenile may rebut the presumption of certification with "clear and convincing evidence that retaining the proceeding in the juvenile court serves public safety." Minn. Stat. § 260B.125, subd. 3. If the juvenile rebuts the presumption, the proceedings are retained in the juvenile court system under EJJ designation. *Id.,* subd. 8. But if the juvenile fails to provide sufficient evidence to rebut the presumption, the matter must be certified. *Id.,* subd. 3.

In determining whether retaining the proceeding in juvenile court would serve public safety, the district court must consider six factors: (1) the seriousness of the alleged offense; (2) the culpability of the child in committing the alleged offense; (3)

the child's prior record of delinquency; (4) the child's programming history; (5) the adequacy of punishment or programming available in the juvenile system; and (6) the dispositional options available for the child. *Id.*, subd. 4. Of these six factors, the court must give greater weight to the first and third factors regarding the seriousness of the offense and the child's record of delinquency. *Id.* Here, the district court concluded that factors one, two, and three favored adult certification and that factors four, five, and six favored EJJ designation.

## I. The district court erred when it found respondent had produced clear and convincing evidence that the fourth, fifth, and sixth factors favored EJJ designation.

In designating respondent for EJJ, the district court decided that, even in the face of the statutory requirement that factors one and three be assigned greater weight, the public safety is better served not by putting respondent in prison but by rehabilitating him through the services available in the juvenile system.

■ The district court is afforded considerable discretion to reach this conclusion. *In re Welfare of K.M.*, 544 N.W.2d 781, 784 (Minn.App.1996). However, "[i]f the child fails to provide sufficient evidence regarding each of the statutory factors, the matter must be certified." *L.M.*, 719 N.W.2d at 711. If respondent has failed to meet his evidentiary burden, we must then determine whether the district court's evaluation of the evidence was clearly erroneous so as to constitute an abuse of discretion. *See St. Louis County v. S.D.S.*, 610 N.W.2d 644, 647 (Minn.App.2000).

We begin by considering the district court's conclusion that the fourth factor weighs in favor of an EJJ designation. The fourth factor enumerated in Minn.

Stat. § 260B.125, subd. 4, requires the district court to weigh "the child's programming history, including the child's past willingness to participate meaningfully in available programming." The state argues that the district court erred when it found that respondent's programming history weighed against certification. We agree.

■ "[N]oncompliance and failures at numerous types of juvenile treatment and dispositional programs" are considerations relevant to the fourth factor, and so is good performance following such programming. *In re Welfare of H.S.H.*, 609 N.W.2d 259, 263 (Minn.App.2000). The state contends that respondent has failed to complete programming, internalize the lessons of the programming he has participated in, and has shown an unwillingness to be rehabilitated. Relying on *In re Welfare of U.S.*, 612 N.W.2d 192, 196 (Minn. App.2000), the state argues that rejecting programming by failing to complete the program and reoffending indicates that respondent is not willing to submit to programming in a meaningful way.

The district court received evidence that respondent completed the classroom portion of the gun offender program but did not complete its community service portion. As a result, respondent was ordered to participate in an evening reporting center program, where his attendance was sporadic until threatened with suspension by the center's staff. While respondent achieved good attendance for nearly two months, he never again met attendance requirements after his child was born. The district court also noted that respondent violated numerous aspects of his probation: he did not complete court-ordered programming, he failed to attend school, and he failed to remain law-abiding.

The district court heard testimony from Bach that respondent's programming his-

tory "leads me to believe that [P.C.T.] appears amenable to treatment, and more so amenable to treatment within a structured setting." In his report, Renken opined that respondent "has shown an ability to cooperate with adults and authority figures and to do well in structured programming, although he has not done so consistently," but noted that it is difficult to predict respondent's future risk of violence in response to future programming. Renken concluded that respondent's risk for future violence is "high" but it is "reasonable" to expect that programming would "significantly lower[ ]" that risk. On this record, the district court noted that respondent has a limited programming history and has failed to complete programming, but "has demonstrated past willingness to participate meaningfully in available programming while in a structured setting" and determined that this factor weighed against adult certification.

■ Under the statute, the court was required to weigh "the child's programming history, *including* the child's past willingness to participate meaningfully in available programming." Minn.Stat. § 160B.125, subd. 4 (emphasis added). Although meaningful participation in programming is specifically enumerated, the statute's use of the word "including" means that respondent's meaningful participation was not the only consideration to be weighed for or against adult certification. Other considerations necessarily include the child's attendance at programming events, completion of the events, and demonstrated behavioral changes correlated with the programming. Respondent has failed on each count: his attendance at the gun offender program and evening reporting center was sporadic, he failed to complete either program, and rather than show the types of positive behavioral changes that the programs hope to achieve, respondent has escalated the severity and violence of his behavior.

■ We agree that respondent has demonstrated an occasional willingness to participate in juvenile programming. But we are not persuaded that these sporadic efforts support the conclusion that injecting more "structure" into respondent's treatment will lead to better results. Respondent's occasional good-faith participation in programming appears only in response to threats of immediate consequences and fades when the consequences become less likely. It is telling that respondent has hardly darkened the doorstep of a school or participated in online schooling in more than a year, except for his schooling at the juvenile detention center while being held for these charges. He has a long history of behavioral problems in school and we note that school is probably the most structured environment that an American youth experiences.

Nor are we persuaded by the conclusion that, because no court has yet to order respondent to participate in out-of-home placement programming, that this becomes the next logical programming step. Juvenile delinquency programming does not function like a flow chart, where each alternative must be tried before moving onto the next one. Having failed to achieve a reliable and consistently positive outcome in any of the programming respondent has tried so far, we are not inclined to agree with the district court that the public safety will be served by placing respondent in yet another juvenile delinquency program.

Respondent had the burden of showing by clear and convincing evidence that his past programming supports EJJ designation. The record reflects that, by any objective measure, he has not experienced lasting success in the programs in which he participated. From this record it was clear error to conclude that the few exam-

ples of respondent's participation in programming prior to March 5 constituted clear and convincing evidence that public safety would be served by placing respondent in juvenile programming.

■ Although the state has not raised the issue, our analysis of the fourth factor has implications for factors five and six relating to the adequacy of punishment or programming in the juvenile system and the dispositional options in the juvenile and adult corrections systems. The various alternatives available in the juvenile and adult systems were explored at the certification hearing. While Bach conceded that sending respondent to the adult correctional system would ensure public safety, her testimony did not offer an equivalently promising assessment of the public safety benefits of residential placement in the juvenile system. Bach's conclusion that EJJ provides a better public safety outcome is speculative at best, especially since respondent has never been placed in residential treatment. Nonetheless, the district court weighed the fifth and sixth factors regarding the adequacy of punishment or programming in the juvenile system in favor of EJJ designation, concluding that adult certification would deny respondent the "breadth and depth of treatment" and the corresponding "opportunity to rehabilitate himself." The district court also noted that EJJ designation would give the court jurisdiction over respondent until his 21st birthday, with a stayed prison sentence hanging over him if he violated probation.

The record contains only limited descriptions of the actual nature and details of the rehabilitative programming that would be available in either the juvenile or the adult system, but respondent plainly did not meet his burden of demonstrating by clear and convincing evidence that re-

taining this case in the juvenile justice system would serve public safety.

The district court, in weighing these factors in favor of EJJ designation, concluded that respondent is at a "significant risk for continued violence if he does not receive appropriate interventions." But, as discussed above, the record does not lend clear and convincing evidence to the conclusion that "appropriate interventions" will address the significant risk of respondent engaging in ongoing violence, especially when compared with the assured benefit to public safety that accompanies the 159 months in prison that respondent faces on each count if certified as an adult. With permissive consecutive sentencing, his adult sentence could be 477 months or more. We conclude that the district court erroneously weighed the fifth and sixth factors in favor of EJJ designation.

## II. The district court failed to assign sufficient weight to the first and third factors.

The state next argues that the district court properly found that the first and third factors weigh in favor of certification but that, in the final analysis, it did not place sufficiently heavy weight on these factors. Respondent argues that the statute plainly requires the first and third factors to be given heavier weight, but that nothing in the statute deprives the district court of its discretion to determine that, in spite of the heavy weight afforded the two factors, they are not outweighed by other considerations.

■ "We cannot emphasize too strongly that the district court must place greater weight on the severity of the alleged crime and the prior delinquency record of the juvenile in deciding whether to certify." *S.D.S.*, 610 N.W.2d at 650. In *S.D.S.*, the district court was found to have understated the seriousness of S.D.S.'s al-

leged offenses and mischaracterized his prior record of delinquency as "minimal," when he had four gang-related misdemeanors on his record. *Id.* at 648–49. This court concluded that the district court abused its discretion when it placed extra emphasis on S.D.S.'s programming history and dispositional options but ignored facts indicating that the alleged offenses were serious and his prior delinquency record was extensive. *Id.* at 650. A similar error is present here because the district court incorrectly concluded that respondent's amenability to programming and the adequacy of juvenile programming were proved by clear and convincing evidence and that they outweighed the statutory mandate to assign greater weight to the first and third factors.

Minn.Stat. § 260B.125, subd. 4, provides that the statutory factors are a tool to determine "whether the public safety is served by certifying the matter." We recognize that the six statutory factors "must be applied but are not a rigid, mathematical equation." *In re Welfare of D.M.D., Jr.*, 607 N.W.2d 432, 438 (Minn.2000). Instead, we emphasize again that public safety is the touchstone of the analysis.

As such, respondent had the burden to rebut the presumption of adult certification with clear and convincing evidence that retaining the proceeding in the juvenile court serves public safety, but the seriousness of his offense and his prior record weighed against EJJ designation with greater weight than the district court applied here and were certainly not outweighed by the last three factors.

The first statutory factor weighs particularly heavy here, given the extreme gravity of respondent's offenses. The offenses include two additional aggravating factors: the use of a firearm and the commission of the crimes for the benefit of a gang. Multiple shots were fired at multiple people on three different occasions separated by time and place. Fortunately, none of the shots were fatal. Had any of the targets or anyone down range in this heavily populated urban area been killed, respondent would likely face a charge of first-degree murder and automatic adult certification. *See* Minn.Stat. §§ 260B.125, subd. 10, .130, subd. 6.

The third factor relating to respondent's prior record of delinquency is also significant because his record included a felony firearm violation. Respondent's record documents his troubling tendency to engage in increasingly dangerous activity.[1]

We are guided in this analysis by *S.D.S.*, where this court determined that the district court erred when it found EJJ dispositional options favorable to adult corrections. *S.D.S.*, 610 N.W.2d at 650. While there was no dispute that juvenile dispositional options were available to the child, "these options are outweighed by the seriousness of respondent's alleged offenses and his prior delinquency record, which must be given greater weight and which, when considered in light of the factors, favor certification." *Id.*

The same is true here: the potential benefits of juvenile programming are outweighed by the seriousness of respondent's alleged offenses and his prior delinquency record. The district court indicated its awareness that the first and third factors receive greater weight, but in the final analysis failed to correctly balance all the factors by not giving these two factors

1. The gravity of the second factor, relating to respondent's culpability, also cannot be overstated: nothing in the record suggests that respondent was goaded, misled, or pressured by an outside force into committing these crimes. On his own volition, he armed himself, rallied his friends, and led them on a shooting spree in Minneapolis.

sufficient weight. The severe public safety concerns present in this case and the heavier weight given to the first and third factors, make it difficult, if not impossible, for this child to rebut the presumption for adult certification by clear and convincing evidence.

We do not mean to conclude (nor does the statute suggest) that the first and third factors when combined with another factor supporting certification will always require adult certification. In some cases, the public safety risk is not as extreme as in this case and it may be appropriate to favor rehabilitation where the district court has received reasonable assurances that rehabilitation can be successful. Our legislature has directed that the seriousness of the crime and the offender's prior record figure heavily in the public-safety consideration. These two factors are almost certain to occur differently in each case. Had the legislature intended an automatic result when the first and third factors combine with another factor in favor of certification, it would have crafted the statute differently. And we can conceive of any number of circumstances where a district court could properly exercise its discretion to designate a juvenile for EJJ even when the child committed a serious offense and has a history of delinquency. The point at which the public safety is so at risk that behavior modification in the juvenile system cannot be attempted is not susceptible to definition. It must be decided on a case-by-case basis.

This point also closely relates to the state's contention that the district court improperly placed rehabilitation ahead of public safety. It can be the case that public safety is best served by rehabilitation efforts as opposed to incarceration. But we note that a district court that chooses the rehabilitation options of EJJ over adult corrections allies itself with at least some uncertainty in the outcome because rehabilitation efforts usually involve imperfect social and psychological techniques aimed at permanently changing human behavior. At most, the district court might find that rehabilitation efforts reasonably assure that public safety is protected. On its own, this is not enough to rebut the presumption for adult certification by clear and convincing evidence, although it may become sufficient in combination with a good showing under other factors. But where, as here, failure at rehabilitation will create an extreme risk to public safety, the heavier weight given by the statute to the first and third factors evidences our legislature's recognition that the risk is too great to justify an attempt to modify this offender's behavior in the juvenile system. The district court erred when it placed respondent's speculative potential for rehabilitation over public safety.

In light of the extremely serious crimes he is accused of, respondent needed to show clear and convincing evidence that he has been meaningfully improved by juvenile programming and that future programming between now and his 21st birthday will succeed. Respondent has not met this heavy burden. By making public safety the predominant concern, the statute assures the public that an offender as dangerous as the respondent will not be shooting up another neighborhood anytime soon. He should be certified to stand trial as an adult.

## DECISION

The district court abused its discretion when it concluded that respondent had presented clear and convincing evidence to rebut the presumption of adult certification. We reverse, order that respondent be certified to stand trial as an adult, and

remand for further proceedings consistent with this opinion.

**Reversed and remanded.**